BLANTON WINSHIP, GOVERNOR OF PUERTO RICO, Complainant and Appellant, *v.* MUNICIPAL ASSEMBLY OF MANATÍ, Appellee.

No. 8.—Argued January, 9, 1939.—Decided July 29, 1939.

440

*B. Fernández García, Attorney General, Jesús A. González, Assistant Attorney General* and *Enrique Córdova Díaz, Assistant Attorney General,* for appellant. *C. Iriarte, F. Fernández Cuyar* and *H. González Blanes* for the impeached mayor.

Mr. Justice Hutchison delivered the opinion of the Court.

The Municipal Assembly of Manatí, in an impeachment proceeding, exonerated the mayor on the theory that fifty-six charges formulated and submitted by the Governor of Puerto Rico had not been established beyond a reasonable doubt.

The first six charges were, in substance, that the mayor, after collecting money for the purchase of fire hose and the repair of fire hydrants, had appropriated the same and had spent it for other purposes without having deposited it in the municipal treasury.

The first charge specified a check received from Jaime Calaf, December 17, 1937. In a preliminary investigation, Calaf had stated that this check represented a donation for the purchase of fire hose. In the course of the impeachment proceeding, he testified that this donation had been made for the purpose of repairing the streets and that another check, dated May 13, had been given for the purchase of fire hose. The check of December 17 was not deposited in the municipal treasury. It was endorsed by the mayor and delivered by him to Eliseo Martínez in payment for certain tools which were used in repairing the streets. The check was cashed by the treasurer at the request of Martínez, who did not endorse it but received the proceeds.

The second charge specified a check for $75 signed by Víctor García. It represented a donation of $50 by García and $25 by Ramón Menéndez. García was a member of the commission which visited most of the insurance companies in San Juan, soliciting contributions for the purchase of fire hose and the repair of fire hydrants. The mayor was also a member of this commission. Both donations were made for the purpose indicated. The mayor told Menéndez that

he intended to use any surplus for the maintenance of the municipal hospital. Two weeks later, he told García that they had no funds for the hospital and asked him whether he had any objection to the spending of the money in providing for the sick. García told him to do as he wished. The check for $75 was never deposited in the municipal treasury. The mayor deposited June 24, 1937, $114.64 and $91.57 and June 30, $99.30. In a certificate issued by the municipal treasurer, the first two appeared as intended for the repair of streets, and the third for the maintenance of the hospital. The treasurer testified that the mayor had given him the money and told him that it had been collected. At the time of this testimony, the treasurer's books contained no entry of any item that could be identified by him as representing a donation or donations for fire hose or fire hydrants.

The third charge specified $10 received from Manuel San Juan, March 31, 1937. The municipal treasurer cashed a check for this amount payable to the order of the mayor, and presented by him. Neither the check, nor the money received by the mayor from the treasurer, was deposited in the municipal treasury at that time. Later, the mayor deposited the larger sums already mentioned. The last of these deposits was accompanied by a list of donors. San Juan's name did not appear on this list.

The fourth charge specified $20 reecived from A. Trigo & Co. April 26, 1937. The check was received by García and delivered by him to the mayor. It was payable to García or to his order, endorsed by him, by Orestes Ramos, and by the Aquarium Bar Co. for deposit to its account.

The fifth charge specified $10 received from Albert E. Lee & Son, Inc. April 26, 1937. The sixth specified $5 received from Adolph Steffens April 30, 1937. Both checks were payable to García or his order. Both were endorsed by García and by the mayor and deposited by the mayor to his account in the National City Bank, July 30, 1937.

For the defense, Arsenio Carreras, treasurer and school director, testified that: He received June 24, 1937, a donation of $114.64; another of $91.57 and June 30 another of $99.30, a total of $245.21. It was all in cash, no checks. It was received from the mayor in person. The mayor indicated the manner in which he wished these donations to be used. He did not name the donors.

On cross examination: The $114.64 was deposited for the repair of streets. Witness did not know who the donors were; the list was not delivered. It had been the invariable custom in accordance with the auditor's rules and regulations to state the names of the donors.

On re-direct: The $114.64 was for street cleaning; the $91.57 for the repair of streets, the $99.30 for hospital maintenance. On further cross examination: The $114.64 was delivered by the mayor as a donation for street cleaning. It was not the surplus of any donation for fire hose and fire hydrants deposited by virtue of any resolution passed by the administrative board. The original entry of the $114.64 was for street cleaning; it was used for that purpose. The $91.57 entered as a donation for the repair of streets was not the surplus of any donation made to the municipality for the purchase of fire hose and fire hydrants. The $91.57 was not deposited in the municipal treasury by any resolution of the municipal administrative board as the surplus of any donation made for the purchase of fire hose. The $99.30 deposited for maintenance of the municipal hospital was not the surplus of any donation made to the municipality for the purchase of fire hose and fire hydrants. The $99.30 did not enter the municipal treasury by virtue of any resolution of the municipal administrative board as the surplus of any donation for the purchase of fire hose or fire hydrants. The donation of $99.30 did not enter the municipal treasury as the surplus of any donation made for the purchase of fire hose or fire hydrants by virtue of any resolution of the municipal administrative board. On February 26, 1938, the

mayor gave witness a list of the donors who contributed to the last donation of $95. This was after the investigation had begun. The investigator, García González, had arrived on the 2nd. Witness had no list of the donors who contributed to the $114.64; to the $91.57 or to the $99.30.

On further re-direct: That money was used for legitimate municipal purposes and was not appropriated by the mayor; it was used for the purposes indicated.

Mamerto Vigo, a mechanic, identified a receipted bill, dated June 20, 1937, of $48 for the repair of six hydrants. The bill represented work done for the municipality. It was paid by the mayor in cash. Witness had refused to do the work for the municipality, and the mayor said he would pay for it. Witness demanded cash payment. The mayor offered to pay in checks which witness refused to accept. On the following day the account was paid in cash.

On cross examination: Witness did not present his account to the municipality. He told the mayor he would not do any more work for the municipality; he did the work on the mayor's promise to pay for it; payment was made June 21, 1937, the day after the date of the bill. The mayor sent for the hydrant and witness refused to deliver it. Witness had presented a bill in the form of a carbon copy to the mayor in his name, and the mayor had told him to put it in the name of the municipality. Witness had always had billheads. The billhead for the statement of June 20, 1937, was printed by Miranda. Witness did not remember the date. It might have been in February, 1938.

On re-direct: Witness had not said that this was the first statement which he gave the mayor; witness had stated that he had given the mayor a statement in the form of a carbon copy and that the mayor had not wanted it because it did not have the name of witness and witness had to give him the other statement.

On further cross examination: Witness had given the mayor the last statement within a month or two before the

date of his appearance as a witness in the impeachment proceeding. The mayor had kept the first statement.

On further re-direct: The second statement was based on the first and the mayor kept them both. The first statement read: "Virgilio Ramos Muñiz" and he wanted it to read: "Municipality of Manatí." The work had been done for the municipality. The second statement was a copy of the first.

Virgilio Ramos Muñiz testified: Witness was a merchant, a farmer and had been for some eighteen months, since January 11, 1937, the Mayor of Manatí. The municipal assembly had not been permitted to enter upon the discharge of its official duties. It had begun to function for the first time within the past two months. Witness, during some sixteen months, had been working without a municipal assembly. During the months of March to June 1937, witness was collecting money. Most of the time he was acting alone; at time he was accompanied by others. The outgoing administration left things in a deplorable condition as do all political parties. Witness was obliged to collect money. He received from Víctor García a donation of $50. García said: "I give you the $50 and as much as you ask; go ahead and don't worry." Ramón Menéndez gave witness $25 through García; García gave it to witness to be used as witness might see fit, and charged it to Menéndez. These two donations were included in a single check. It had no relation to any donation for fire hose or hydrants. The money collected for fire hydrants was aside from the $75. Witness cashed the check in the safe at his place of business. There were no banks in Manatí and he had accounts in The National City Bank and the Banco Popular in San Juan. He did not remember what he did with the check. He had heard the testimony of employees of the General Motors Acceptance Corporation that the check had been given in payment of a note given for the purpose of an automobile. Witness was the surety for the automobile; witness did not remember whether he had paid as surety or whether he had given it

to Antonio Vélez Alvarado. Witness received the check for $10 from Manuel San Juan, went to the municipal treasurer and cashed it. He received a check for $20 from A. Trigo & Co. The insurance company sent that check to Víctor García and he delivered it with others to witness. The check was to the order of Víctor García, who endorsed it and gave it to witness for the collection connected with fire hose and the repair of fire hydrants. Witness cashed it in his safe and later put it in circulation. It was used in payment of an account with Orestes Ramos, who cashed it in the Aquarium. The proceeds were deposited with the proceeds of the other checks for the repair of fire hydrants. Witness received a check for $10 from Albert E. Lee & Son. It was payable to the order of Víctor García and came into the possession of witness with García's endorsement. This check for $10 and the other for $5 received from Adolph Steffens and the rest in cash, witness gave to Vigo for the repair of the fire hydrants. Vigo did not want the checks and witness then cashed the checks in his safe and paid Vigo in cash. Witness then deposited the checks with an additional $25 to his account in the bank. Witness and García went to San Juan to collect money for the repair of fire hydrants and the purchase of fire hose. Such hydrants as were in serviceable condition had been repaired. $48 was spent in this matter. The collection was finished in June and at that time the auditor was sick fifteen days and when witness made the cash payment there was no auditor to whom the money could be delivered and witness paid Vigo in cash. Vigo gave witness a receipt in the name of Virgilio Ramos Muñiz. Some months later witness went to Vigo and asked him for another receipt which could be legally presented by witness when required. Witness paid Vigo in bills June 21, 1937. He used the $75, proceeds of the García check, to pay for food used in the hospital—$292.50, for the food so used. When witness took charge, that item in the budget had been overdrawn to the amount of $10.90. From January to June, 1937, it had been

maintained by witness begging on the streets like a mendicant. Out of his own pocket he made one payment of $99 on the hospital account. After that payment none was made until June because there was no money. The $90 (*sic*) was paid in part out of money which had been solicited by witness and in part out of money belonging to witness. The $290.50 paid in June was on the hospital account for rice and beans. The owner of the store was Alberto Montes. The $75 received from Víctor García was included in this. There were other persons whom witness visited and asked to contribute in order to sustain the hospital. The contributions received from March to June 1937, amounted to $351.50. This included those received from Albert Lee, Steffens, Manuel San Juan and Trigo. Of this, $290.50 went for rice and beans and $48 was paid to Vigo. Witness paid Alberto Montes the $290.50 on the day following receipt of a letter from him. The commission that went to San Juan to collect for fire hose was composed of witness, Víctor García and Teodomiro Taboas. The purpose for which García's check had been given was not specified. The $48 was paid out of the proceeds of the checks received in San Juan for the repair of fire hydrants. There was a surplus of $61. This, with the proceeds of another collection, was used to meet an obligation assumed by witness with the P.R.R.A. to supply certain materials for the construction of three streets, upon which work had been suspended; but that was another collection. Witness had ordered the fire hose in good faith from the Goodyear Company, but did not pay for it because if witness had not paid the store account, he would not have had food for the hospital on July 1. Witness had ordered the hose after the collection had been made on the day when he went to San Juan with García. The order was cancelled because there was no money. The $390 was not deposited in the municipal treasury because when witness had finished collecting it, the auditor was sick. Witness could not have deposited it even if he had desired because the auditor was ill.

Then came a letter from Alberto Montes and the auditor was in bed. The contribution for $114 had nothing to do with the collection of $390. That was a party contribution. Witness had collected from his party in order to avoid a labor strike. The laborers had not been paid for two weeks and the situation could not be permitted to continue. In order to pay the workmen and to meet other obligations, witness had to beg on the streets. It was not that witness wanted to repair the streets; they had been left in bad condition and could not be repaired with a few stones. There was no money in the treasury for that purpose. The $114 was party money; a percentage contributed by municipal employees. The other items of $91 and $99 were solicited by witness.

On cross examination:

When witness took charge, he found on hand $900 for six months. Out of a budget of $83,000, he needed $42,000 for the six months and had only $900. He had to find $39,000 to carry on the administration for six months. A donation of February 2, 1937, by Gabriel Martínez for the repair of streets, was a more or less involuntary donation extracted from the donor by witness. A donation received from Jaime Calaf was for the repair of Celis Aguilera Street. The $114.64 was regarded by witness as having come directly from the party funds. Either the $114.64, or the $91.57, was taken by witness out of the party administration. As to the other, witness did not remember. One for public cleaning came out of the party and one for the repair of streets came out of the party. The hospital maintenance came out of funds solicited by witness. An item of $95 of February 26, 1938, for hospital maintenance was solicited by witness. When the collection for fire hose and for the repair of hydrants had been completed, there was no auditor. There was a treasurer. The auditor was sick during the latter part of June, 1937. Witness believed it unnecessary to deposit the checks before completing the collection. He did not deposit the money in the municipal treasury. Witness was surety for the auto-

mobile; he did not remember whether he had transferred the García check for $75 in payment for the car, or as a loan to Antonio Vélez Alvarado. He did not remember the date; it was between May 1 and May 13. The money witness had removed from the safe in his place of business and had kept it in a steel filing case in the mayor's office. He used it for municipal purposes near the end of June, 1937. He had collected $351.50. This $75 was included in this $351.50, which witness had collected in checks and in cash. It was expended as a part of the $351.50. The smaller portion was the $48 for repair of the fire hydrants, the larger portion was the $290.50 paid to the store, and the balance of $6 was added to another collection for the purchase of tools promised the P.R.R.A. Forty-eight dollars was paid to Vigo, June 20; $290.50 to Alberto Montes, June 30 or July 1, and the remaining $61 was added to the collection for the P.R.R.A. and used in the purchase of tools promised the P.R.R.A. The tools amounted to $206. Manuel San Juan's check for $10 witness turned over to the municipal treasurer from whom he received $10 in cash. This $10 he placed in the steel filing case with the other money which he kept there. The municipal accounts were overdrawn; if the money had been deposited, it would have been lost; there were outstanding certificates; if it had been deposited in a special fund it could not have been used as needed; the needs were numerous and the money was spent where the need was most urgent, whether it had been collected for that purpose or for some other purpose. Witness cashed the check for $10 received from Albert E. Lee & Son in a safe together with the check for $5 received from Steffens, after Vigo had refused to accept these checks in part payment for the repairing of fire hydrants. Witness kept the Lee check for three months, April, May and June. The check for $20 dated April 20, 1937, payable to the order of García, signed by A. Trigo & Co. and paid by the bank, July 22, was also in the possession of witness for two or three months. Wit-

ness had cashed it in his safe and placed the $20 in his filing case. Later, he put it in circulation in the course of his business transactions with Orestes. The auditor was sick from June 15 to July 1. He was the mayor's secretary in whom the mayor had confidence. He was needed for consultation. If the mayor had deposited money as a donation, it could not have been transferred thereafter for want of a municipal assembly. It might be that the auditor during the latter part of his illness had been in his office at intervals. He might have worked at times and the mayor might have been away at such times. The Víctor García check for $75, the Lee check for $10, etc., were not included in the donations, $114 of June 24, 1937, $91.57 of June 24, 1937 and $99 of June 30, 1937. When witness had finished his collection at the end of June, the auditor was sick.

On re-direct:

The donations which appeared as having been deposited June 20, June 24 and June 30 of $114, $91 and $99 were deposited in the treasury for the purposes indicated; perhaps if there had been an assembly they might have been changed; the corresponding expenses were being paid from those items. There was an item in the budget for the repair of fire hydrants; it had been overdrawn in June, 1937. If the money collected for the repair of fire hydrants had been deposited as a fund for that purpose, it would have been necessary to meet the overdraft, or the money might have gone to satisfy outstanding certificates which could not be paid out of other funds; if witness had deposited the money all that he had done might have come to naught. When witness took charge, the hospital account had been overdrawn to the amount of $6.69. It was still overdrawn, June 30. If witness had made the deposit, the result would have been the same. All the money had been used for municipal purposes; if more money had been available, witness would have spent it.

450

Alberto Montes:

Had furnished supplies for the municipal hospital. In a letter of June 30, 1937, witness had informed the mayor that unless the account was paid, he could not continue to furnish supplies. The municipality owed him at that time $357.45 for provisions furnished the hospital during April, May and June. The mayor had paid $290.50 July 1 in cash.

On cross-examination:

Witness had a working capital of $1,500, more or less. He did a credit business. He sent the municipality a statement June 30. He had sent the municipality monthly statements. The $357.45 was for April, May and June. He did not remember the amount for April, but he had sent the statement. The letter was written June 30, not afterwards. Witness had sent the monthly statements. The orders had come from the hospital. They were written by the superintendent, not by the director of charities. Witness did not receive orders from the municipality, only orders from the superintendent, but he believed they had been signed by the mayor. The orders were sent by the superintendent. Witness had no order from the director of charities, no order signed by the director of charities. The mayor in person had paid witness $280, June 30. The indebtedness amounted to $357.45 at that time. Monthly statements of account had been rendered. Witness had retained the notes in his place of business and had sent a statement of account at the end of each month and had enclosed the orders. Witness had sent twenty-eight invoices corresponding to the month of March, 1937, to the municipality in a statement of account. He did not remember whether he had signed them. They would send witness the note from the hospital, and he would copy it in triplicate in a book; he would keep a triplicate and at the end of the month put down: "According to note: $2.76; March 2, March 3." The account for the month of March had been paid by the auditor. Witness had written thirty-three invoices corresponding to the month of April and others

for the months of May and June. Witness had never with-
drawn the statements of account sent by him to the munic-
ipality. Witness sent the municipality a statement of ac-
count amounting to $357.45, June 30. Witness had never
settled with the municipality for the balance of this account.

On re-direct:

As the municipality had been paying regularly since the
first of July, the balance, the difference between $357 and
$290 was still pending. Witness had tried to collect, but the
balance was still pending.

Alberto Montes, in rebuttal, after identifying a journal
and a ledger as the books which he had kept:

The journal had been used for daily entries; but some-
times these had been made directly in the ledger. The entry
of $290.50 had been made directly in the ledger. That item
had not been entered in the journal. The balance for June
30, 1937 amounted to $457.25. The $290 was credited July
1, 1937. The balance brought forward was $166.75. The
balance of $457.25 was on page 88 of the ledger. The $290
was credited on that page. The balance was $166.75. It
was brought forward to page 99. There had been an error
in the date of entry. There was an erasure on page 99. It
appeared as of June 1. Witness had made a mistake. The
balance was brought forward July 1. There was another
slight error. It appeared as 19, but it was July 1. Then
witness had received a check from the municipality July 20
for $99.30 which left a balance of $67.45. The date 19 was
a mistake. It might have been an error that all the numbers
subsequent to the balance of $166.75 on page 99 appeared to
have been erased and new numbers written in. Witness did
not have any liquid; the erasures of the entries, numbers 1
to 20 in the column of balances on page 99, must have been
made with a rubber.

On cross-examination:

Witness had not studied accounting; had no had any
experience in accounting. There had been many other mis-

takes in the same ledger. Witness had made frequent mistakes. There had been other erasures. Witness had reached the fifth grade in school. Since he had been obliged to erase at the beginning it was necessary to erase all the numbers; all the numbers had to be changed. The $290 was paid by the mayor. Witness was not obliged to keep books; he was alone in his business. When he made a mistake in his books, he felt at liberty to correct them.

Asked on re-direct to find other erasures in the ledger, witness turned to page 12 and pointed out an entry of May 18. Asked to find a page other than 99 where something had been erased instead of being crossed out, witness made no answer. After the question had been repeated, witness referred to the account of Francisco R. Silva. His attention having been called to the fact that this was not an erasure, he answered that it had been crossed out. Asked to examine the ledger page by page in search of another erasure similar to those en page 99, he answered that there was none "made with a lead pencil". There were various instances where one number had been crossed out and another substituted. Asked as to what had been his usual procedure when a mistake had been made in the ledger, witness answered: "To cross out or to erase". Asked whether, notwithstanding that practice, there was only one erasure and many things crossed out, he answered that the municipal account had been the largest. He did not know whether there was another erasure in the rest of the book.

On further redirect:

Witness had examined the ledger page by page in order to ascertain whether there were other erasures like those on page 99 and had found none.

On further cross-examination.

The erasure on page 99 had been in a single column. The book had three columns: "Debit, Credit and Balances." When witness had entered the $166.75, he had placed it in the debit column. If the numbers of page 99 had not been

erased, if they had not been corrected, the account would not have balanced. The correction was necessary because of the transfer of an item from the debit column to the balance column.

On further redirect:

Witness did not remember when he had noticed the mistake which made necessary the erasures on page 99. There had been a mistake in the first entry of $166.75, it had to come in the debit column, then witness had begun to erase in order to balance. The last erasure on page 99 was the item of March 31, 1938. Witness did not remember whether he had noticed the mistake after March 1 (sic), 1938.

We have before us photostatic copies of pages 58 and 99 of the ledger. The first entry on page 99 is dated July 19. The 9 in the 19 appears to have been superimposed on another number. The item appears to have been brought forward from page 88 and is entered in the balance column as $166.75. The photostatic copy shows clearly that an erasure had been made before the $166.75 was first written in and then crossed out. The second entry is also dated July 19. The 19 appears to have been written over a number 2 or over some number containing that digit. In the debit column is written $166.46. In line with this, the same amount appears in the balance column. It appears to have been written over an erasure. The next entry dated July 20, shows a credit of $99.30 and the balance of $67.45. The $67.45 appears to have been written over an erasure. All the other balances to March 31, appear to have been written over erasures. Obviously the mistake in the first or second entry—if it was a mistake—had not been discovered prior to March 31, 1938. Otherwise it would not have been necessary to erase and correct the balance of that date. Assuming for the sake of argument, that there had been a mistake in the first or second entry, the necessity for erasing and rewriting all subsequent balances to March 31, is not very apparent. On January 31, an error of three cents had been

noted and the three cents credited to the municipality without the necessity of any erasure or alteration. We see no reason why the same procedure should not have been followed on March 31 by simply noting the error in the first or second entry and correcting the balance by means of a simple arithmetical operation. In any event, if alterations in all balances from and after July 1, 1937 to March 31, 1938, had become necessary in order to correct an honest mistake, the crossing out of the old balances instead of erasing them before writing in the new, would have been much simpler and easier—especially for Montes who was accustomed to that method. His sudden abandonment of his previous practice of crossing out mistakes, and his adoption of the more laborious method of erasure and re-writing of some twenty balances, remains unexplained. His attempted explanation of the erasures was a signal failure. He did not explain why an erasure had been necessary in the very first entry in the balance column before writing in the balance of $166.75 brought forward from page 88 after the credit of $290.50 had been entered on that page.

The investigation which gave rise to the impeachment proceeding began in Manatí, March 29, 1938. The investigator had an interview with the mayor in the afternoon of March 30. The account on page 88 of the Montes' ledger covered the first half only of that page. If the credit of $290.50 had not been entered on July 1, 1937, and if the mayor on March 31, 1938, had desired to make such an entry with the consent and cooperation of Montes, there was nothing on page 88 to prevent it. The logical explanation of the erasures and alterations on page 99 would seem to be that the final entry on page 88 was not made on July 1, 1937, but on March 31, 1938.

The receipted bill, offered in evidence to support the claim that $48 had been paid to Vigo, June 20, 1937, was also an antedated afterthought. The mayor obtained the receipted bill after the investigation was under way shortly

before the trial in the impeachment proceeding, and more than a year after the date of the alleged payment. This admission was elicited from Vigo on cross examination. The first receipt was not shown to have been lost. On the contrary, according to Vigo, it was in the mayor's possession when he obtained the second receipt a month or two before the trial. It was not offered in evidence.

In the view we take of the case and in view of the conclusion reached by the municipal assembly, it may be conceded for the purposes of this opinion, that the mayor paid Vigo $48, either June 20, 1937, or at least, a month or more prior to August 16, 1938. It may be conceded that he paid Montes $290.50 on or about March 31, 1938. It may be conceded that an amount equivalent to that of the García check for $75.00—with which the mayor, some months before had discharged a personal obligation—was included in the $290.50. It may be conceded that the proceeds of other checks representing donations for fire hose and fire hydrants were included in the $290.50. Hence, it may even be conceded without holding, that he did not, with intent to defraud the municipality, definitely appropriate to his own use any of the money donated for the purchase of fire hose and the repair of fire hydrants.

The mayor was a business man. The monthly volume of his business amounted to not less than $2,000. He had two bank accounts, one in the National City Bank and another in the Banco Popular. Mamerto Vigo's objection to checks could have been easily met. It is hardly conceivable that he could not have been induced to accept the mayor's personal check, if for instance, the mayor had offered to accompany him to the office of the municipal treasurer and see that it was paid. The mayor had experienced no difficulty in cashing other checks in this manner, including one of the Calaf checks for $100. It does not appear that Montes had any objection to checks and if he were in fact paid July 1, 1937, there was no reason why he should not have been paid

by check—to say nothing of the obvious reasons why he should have been paid by check.

None of the money collected for the purchase of fire hose and the repair of fire hydrants was ever deposited in the municipal treasury as required by the rules and regulations. If the alleged payment of $48 to Vigo was a *bona fide* transaction, there was nothing to prevent a deposit in a special fund, and the issuance of a warrant by the auditor, and of a check by the municipal treasurer which Vigo could have cashed in the municipal treasury or at the mayor's place of business. A like procedure might have been followed in the matter of the $290.50 notwithstanding the overdraft of $6.69 in the hospital account.

The mayor was aware of the duty imposed upon him by the regulations as shown by his deposits of $114.64 and $91.57, June 24, or June 20 and June 24, 1937, and of $99.30 on June 30. The overdraft of $6.69 in the hospital account did not prevent the deposit of $99.30 for hospital maintenance. The illness of the auditor during the latter part of June did not prevent the mayor from making these deposits. His statement that he "could not have deposited" the money collected for fire hose and fire hydrants *"even if he had desired* because the auditor was ill" is significant. He did not deposit the money because he did not wish to deposit it.

The seventh charge was that the mayor, with intent to defraud the municipality, had caused to be prepared and prepared, caused to be presented and presented to the municipal auditor and treasurer respectively for acceptance and payment, a bill in the name of José María Valentín for 200 sacks of charcoal amounting to $52, knowing that the said account was false and fraudulent; and had received from the municipal treasurer $52 which he appropriated to his own use, thereby defrauding the municipality.

The mayor had certified that the account was correct, legal and payable to Valentín. He had approved the account for payment. The municipal auditor had examined it and

found it to be correct. What purported to be the name and mark of José María Valentín had been affixed by Eduardo Hernández to an acknowledgment of payment. Eduardo Hernández was the mayor's porter, messenger and confidential agent. He had also signed as a witness to what purported to be Valentín's signature. A check, issued by the municipal treasurer payable to the order of Valentín and apparently endorsed by him, had been endorsed by Orestes Ramos and paid by a bank in San Juan. Valentín had not sold any charcoal to the municipality, had not receipted the bill or voucher and had not endorsed the check. He had not received the proceeds.

The testimony for the defense tended to show that the mayor had talked with Valentín with a view of obtaining the charcoal from him. Valentín did not have the charcoal but had agreed to see a Mr. Howe from whom he thought the charcoal might be obtained for cash. He did not see Mr. Howe. The mayor, in anticipation of payment on delivery, had ordered immediate preparation of the necessary papers. There was also testimony for the defense tending to show: that some days later, José Torres Andino made an unsuccessful effort to find Valentín in Vega Baja where he lived, and had practically purchased the charcoal from Howe and endorsed the name of Valentín on the treasurer's check, when an unidentified individual appeared on the scene and said that the charcoal had been sold; that the charcoal had then been purchased from Orestes Ramos, and that the check with the forged endorsement had been delivered to him in payment. The truck driver who accompanied Torres testified that they had not found Mr. Howe, but had talked to a foreman. Neither Mr. Howe nor the foreman was called as a witness.

Torres Andino testified that: He had gone to the hospital with a sick child, and the hospital superintendent had sent him for the charcoal. We had not found Valentín but had learned from a *jíbaro* that Valentín purchased charcoal

from Mr. Howe. "They" had then gone to Mr. Howe to ask if he sold charcoal and "they" told witness that he did. Witness had the check and endorsed it in order to purchase the charcoal. Then someone had appeared and had said that the charcoal was not for sale because if had been sold. They returned to Manatí and on the Gandía curve there was a dirty *jíbaro* who looked as if he handled charcoal. Witness had asked him if "they" sold charcoal and he had replied in the affirmative.

The obvious inference is that but for the two *jíbaros* and the accuracy of the information furnished by each, the subsequent course of events might have been quite different. The truck driver who accompanied Torres Andino was not an eye witness to the endorsement of the check.

Orestes Ramos testified that the check was not endorsed in his presence but had been endorsed before it was turned over to him. Whether Howe or his foreman would have accepted the check with the endorsement made as described by Torres Andino, if the sale had not been frustrated by information to the effect that the charcoal had been sold— or whether Orestes Ramos would have accepted the check if endorsed in his presence by Torres Andino—does not appear. In any event—if we are to believe the testimony of Torres Andino—the transaction with Orestes Ramos was a purely fortuitous event.

The hospital superintendent testified as to other matters connected with the charcoal incident but was not asked and did not say whether she had sent Torres Andino to Vega Baja or elsewhere for the charcoal.

The truck driver testified that the mayor had sent Eduardo Hernández to find 200 sacks of charcoal. Hernández had spoken to the truck driver who went with Torres Andino for the charcoal.

Eduardo Hernández was not put on the stand by the defense in connection with the seventh charge. The gist of

his testimony is inserted here because of its bearing on the theory of the defense. He testified that:

The mayor had ordered him to procure the check from the municipality. He had received it on Saturday, had kept it two or three days and had delivered it to Torres Andino, when he called for it at 4 or 5 o'clock in the afternoon. Torres said that he was going for the charcoal; that doña Amparo, the hospital superintendent, had told him to go for it. Then witness said to Torres: "This is for José María Valentín; deliver it to him." Witness believed that this had occurred on Tuesday, at 8 or 8:30. Witness had received the check from Arsenio, not from the mayor. Witness did not know what Torres had done with the check. Witness had caused the papers to be prepared because the mayor had told him to have the check ready when Valentín came for it. At 7 or 7:30 of the day on which witness had delivered the check, they came to him and told him to come and receive the charcoal. Witness went to the mayor, who told him to go and receive it. When witness arrived, one hundred and fifty sacks had been unloaded. He counted the rest. There were two-hundred small sacks. Witness had counted them. The cross on the receipted bill was made by him in Valentín's absence because Valentín had authorized it. Valentín had authorized witness to sign the papers. Witness did not remember the date. Witness had gone to see Valentín about a transaction and Valentín had said: "You may arrange those papers." Witness had delivered the check to Torres in order to avoid two trips.

The mayor testified that: He had talked to Valentín on Sunday, January 16. Valentín had promised to bring the charcoal the following week. Five days had passed and Valentín had not come. On Saturday, witness had to leave town, the offices would close at five o'clock in the afternoon. Witness had informed the auditor that he would have to leave at noon and had told the auditor to have the vouchers ready. The *jíbaros* come to town on Saturday. Witness

had signed the papers, had left town, and had returned on Monday. Valentín had not brought the charcoal. Witness had then to pay out of his own pocket $1.20 for the charcoal used Saturday, Sunday, Monday and Tuesday because Valentín had not brought the charcoal. Witness had left town Saturday noon after signing the papers. On his return they had told him that the charcoal had not arrived. Then witness had paid out of his pocket $1.20. The charcoal arrived Tuesday. On Tuesday, José Torres had taken a sick child to the hospital and, as he had worked for the municipality, the superintendent called his attention to the matter of the charcoal. Then Torres saw Hernández, who was one of the porters as well as the timekeeper. Witness had not seen the charcoal when it arrived but on inquiry had learned of its arrival. Witness had been informed later as to what happened to the check; he had not known at the time. Witness had agreed to pay for the charcoal on delivery. Witness had ordered preparation of the account and the check because he was going away and if Valentín had brought the charcoal and there had been no check, he would not have left it because he would not have left it on credit. The check had been prepared on Saturday. It had not been prepared on the Monday following because that was the beginning of another week and witness was no longer under any obligation. Witness, on his return learned that the charcoal had not arrived because he had been obliged to pay out of his own pocket $1.20 for charcoal.

Asked why, after learning on Monday that Valentín had not brought the charcoal, witness had not looked elsewhere for the charcoal and had not cancelled the transaction which gave rise to the check payable to Valentín, he answered that he had not participated further in that transaction. Asked whether he had not learned of the trip with the check for the charcoal, witness answered that if he knew of it, he had known it afterwards. Asked if he had not been interested in not having to continue to pay for charcoal out of his

pocket, he answered that it was a matter of cents and that he had been interested in rendering services to the hospital and in obtaining the charcoal for reasons previously explained, because the grinding season was about to start and there would be an increase in price. Witness was interested on behalf of the municipality from an economic standpoint and had believed that twenty-six cents was a good price. Asked why he had not ascertained after his return on Monday that the charcoal had not been delivered, he answered that he was a very busy man and could not be pestered about the charcoal. Witness had learned later about the arrival of the charcoal on Tuesday, he had not received any more telephone calls and had not been obliged to spend any more money. Witness was told that the charcoal had arrived Tuesday afternoon. Witness considered the transaction closed from the moment when the check had been drawn and the deal had been closed with an apparently responsible person. Asked whether he had been present when Hernández signed the bill, witness answered that he had nothing to do with that, that those were questions for the auditor and the treasurer.

The municipal offices were to remain open until 5 o'clock Saturday afternoon. Hernández would have had little difficulty in finding the treasurer and auditor after office hours if Valentín had arrived late in the afternoon and had refused to deliver the charcoal before receiving his check. There seems to have been but little reason to expect that he would arrive with the charcoal after 5 o'clock or that if he did, he would have returned to Vega Baja with the charcoal rather than accept delivery of the check on Monday morning as a cash payment. In any event, there was no necessity for the falsification of his mark on the receipted bill in anticipation of his arrival or otherwise.

Orestes Ramos had cashed the Valentín check in San on Monday, January 24. Hence, the trip with the check from Manatí to Vega Baja on Tuesday, January 25, was a

figment of the imagination. The details of the conversation, if any, between Torres Andino and Orestes Ramos on the afternoon of Tuesday, January 25, were equally fictitious, first, because Torres did not have the check at that time, and second, because Orestes himself had cashed the check the day before. Thus, the question as to the exact time and manner in which the check came into the possession of Orestes becomes a matter of speculation. Assuming that Torres and Cabrera had received the charcoal from Orestes shortly before delivery thereof by them in Manatí, they must have received it late in the afternoon or early in the evening of Tuesday, January 25. It is not probable that Orestes received the check while the mayor was out of town, unless he received it from the mayor himself or with the mayor's knowledge and consent. The alternative conclusion is that he must have received it sometime Monday morning after the mayor's return to his office, and with the mayor's knowledge and consent.

Orestes had three farms near Manatí. He testified on cross-examination:

He and his brother had always been on good terms. The brother had told him about some of his administrative difficulties. They did not always talk over these matters. At times they did, when they met. The brother did not know what witness was doing on his farm; because witness never talked to anyone about his business. Witness had not told his brother that he was burning charcoal because it was none of his brother's business.

Orestes, according to his own testimony and the testimony of others in connection with other charges, had come to the rescue of the mayor on at least two previous occasions. If the mayor knew that the charcoal could be obtained from Orestes, he must have known also that his problem could be solved by a word to Orestes. Orestes, it seems, was burning charcoal in large quantities on the Gandía property within a stone's throw of Manatí. He was storing it in the expecta-

tion of obtaining a better price after the beginning of the grinding season. The grinding season of 1938 was to begin in February. At the time of the trial in August, he had on hand 3,000 sacks. He testified in connection with other charges that he and his brother lived in the same house. Manatí is a small town. Whether Orestes had or had not told the mayor in January that he was burning charcoal, the possibility that the mayor was ignorant of that fact seems rather remote.

Valentín was an itinerant merchant. He dealt in charcoal. According to the mayor's version of the transaction with Valentín, the latter had informed the mayor that Howe was selling charcoal in large sacks at seventy-five cents a sack. The mayor had offered sixty-five cents a sack. Valentín seems to have had little interest in the matter but finally agreed to obtain the charcoal from Howe, if possible, at the price offered by the mayor. Valentín probably knew that Orestes had charcoal for sale, even if the mayor did not, and he had no interest in concealing the fact from the mayor.

When the investigation began in March, the mayor was confronted by a condition, not a theory. The Valentín account—certified and approved by the mayor with the false receipt and the Valentín check with its forged endorsement and the additional endorsement by Orestes—required explanation. There was no reason why the mayor should not have purchased the charcoal from Orestes after Valentín's failure to carry out his agreement. But for the Valentín check with its forged endorsement, there would have been no need of a smoke screen. The whole story of the mayor's understanding with Valentín may or may not have been a fabrication like the narrative concerning the Vega Baja junket.

As pointed out in the mayor's testimony, he was under no obligation to accept delivery from Valentín after Saturday, January 22. For reasons also stated in his testimony, he wished to obtain the charcoal without further delay.

Orestes was in San Juan before the bank closed, Monday, January 24. If he received the check in Manatí, he must have received it before or about noon, Monday, although the charcoal was not delivered until Tuesday evening or late Tuesday afternoon. The inference is that the deal was closed when he received the check. Otherwise he would not have received it. The charcoal was purchased from Orestes and paid for with the Valentín check. We find no satisfactory basis for the theory that it was so purchased and paid for without the knowledge or consent of the mayor.

There was testimony tending to show that the papers intended for a cash transaction with Valentín could have been cancelled and new ones prepared, including a check payable to Orestes Ramos, within half an hour. The mayor knew that he had certified the account as correct, legal and owing to Valentín. He knew that he had approved the account for payment. He knew that he had not certified or approved the Orestes Ramos account. He knew or should known that Valentín had not delivered the charcoal. He knew or should have ascertained the fact that Valentín had not endorsed the check. The manner in which the Valentín check was used in payment for the charcoal purchased from Orestes Ramos discloses a contempt for the usual formalities and for the regular method of conducting the business of the municipality that cannot be ignored. We say this because the mayor's attitude toward this irregularity may be considered as a factor in connection with the question as to what importance should be attached to other similar irregularities.

The charcoal was not delivered to the hospital, but to the mayor, or at least was deposited in a storeroom, the key of which he kept.

At the time of the trial the municipal treasurer had drawn no checks for the purchase of charcoal after the date of the Valentín check. This may have been due to the fact that the supply said to have been purchased without the

mayor's knowledge or consent in January, had not been exhausted or it may have been due to the fact that an investigation had been commenced in March.

No one but Torres was willing to assume responsibility for the forged endorsement. Neither the mayor, nor Hernández, nor anyone else in authority seemed disposed to sponsor the Vega Baja trip. Neither the mayor nor his right-hand man, Hernández, could admit knowledge of the endorsement and delivery of the Valentín check without accepting a certain amount of responsibility for such endorsement and delivery and thereby becoming further implicated in an extremely irregular and questionable transaction. Hence, the unsuccessful attempt to establish an unauthorized endorsement and delivery by Torres after the check had been cashed by Orestes. The complete collapse of that attempt leaves the question as to why and by whom the endorsement and delivery were made shrouded in mystery. The theory of a sale to the municipality without the knowledge or consent of the mayor or of any other municipal officer or employee, rests entirely upon the fact that Orestes received the Valentín check and cashed it, coupled with the fact, if it be a fact, that more than twenty-four hours thereafter he delivered to the mayor without the mayor's previous knowledge and consent 200 sacks of charcoal.

For the purposes of this opinion, however, it may be conceded, without finding, that the seventh charge—save in so far as it relates to the mayor's responsibility for the preparation and presentation of the Valentín bill and for the consequences which ensued—was not established by a clear preponderance of the evidence.

The eighth charge was that the mayor during July, August and September 1937, had used a G.M.C. truck belonging to him but disguised as the property of a relative, Jesús Ramos Robles, in disposing of the municipal garbage, and had received for such services $276.

The ninth charge was that the mayor during the months last mentioned, with intent to defraud the People of Puerto Rico, had used a municipal license plate on the truck already described.

The tenth charge was that the mayor during October and November 1937, had used the said truck disguised as the property of his brother, Orestes Ramos, in the removal of municipal garbage, and had received for such services $171.

That the truck carried municipal license plates is an undisputed fact. Unless the mayor was the owner of the truck, however, the facts that it carried municipal license plates would hardly justify his removal from office.

Since the latter part of 1933, the truck had stood in the name of Jesús Ramos. He was not the owner. The question was whether the truck belonged to the mayor or to Orestes. The evidence would have sustained a finding that it belonged to the mayor. The municipal assembly, however, did not so find and after a careful examination of the evidence, we are not disposed to disturb the result.

Charges eleven to fifty-five, inclusive, were in substance that the mayor had certified, approved and presented to the municipal auditor certain pay rolls containing the names of persons who had not rendered the services for which they were paid by the municipality. The persons so placed upon the municipal pay rolls were: Gerardo Carrión; José Rodríguez, also known as Julio Enrique Rodríguez; Ceferino Medina and Gerardo Montano.

Gerardo Montano: Had lived on a property which came into the possession of Orestes Ramos. He had continued to live on the property some nine or ten months. He was there from July 1937 to April 1938. He had to move when they chopped his plantains some three weeks before his appearance as a witness in the impeachment proceeding. He was a *peón* under the orders of Gerardo Carrión on the property of Orestes Ramos. Carrión was the *mayordomo*. Witness milked Virgilio Ramos' cows. He was paid by the municipality; by

the municipal treasurer, Carreras. José Rodríguez, during the months of July 1937 to March 1938, lived within the mayor's enclosure, in a room adjoining the stable. He worked there. He worked for the mayor. He went with witness to the municipality and was paid by Carreras. Ceferino Medina lived in "*el pueblito rojo*" on land which the mayor's brother bought and presented to the poor. He worked for the mayor, cutting grass during the time witness was there. He also was paid by the municipality. On cross-examination: Witness had not said that he worked for Orestes Ramos, but that he lived there; that he had lived nine months with Orestes Ramos, until Orestes Ramos came and told him he was going to cut down the bananas. Witness had never worked for the municipality. The mayor had told him he was to milk the cows in the morning and then come to the municipality "to do a little job of dusting and when he saw a chance to come and milk the cows." Witness was in the offices less than a quarter of an hour in order that the public might see that he was there. Witness "did the dusting, only that." Witness did not remember whether there were eight or nine cows. Ceferino Medina, Julio Enrique and witness worked there. Gerardo Carrión worked for Orestes Ramos on the property belonging to him.

Julio Molina: Gerardo Montano, Ceferino Medina and José Rodríguez worked in the mayor's dairy. There were five or six cows. Montano cut the grass.

Cornelio Escudero: Was in charge of the garbage from the beginning of the Ramos administration to December 6, 1937. Gerardo Carrión did not work with witness at any time during that period. Witness personally delivered to the auditor a list of the *peons* at the end of each week. Gerardo Carrión did not work from January to December, 1937. Witness saw him at times on the property belonging to Orestes Ramos. Witness did not know where Gerardo Montano had worked. He did not know where José Rodríguez had worked. José Rodríguez had not worked with witness.

On cross-examination: Every Friday afternoon witness gave the auditor a list of the *peons* who had worked with him. This list was in the form of an oral statement based on the record which witness kept. Witness, when on his way to work between 8 and 8:30, saw Gerardo Carrión several times at the Orestes Ramos place during a period of three or four months. Witness was in charge of five *peons* and of the truck driver. He was also marshal of the Justice of the Peace court.

Gonzalo Córdova Chirino: Escudero was in charge of the municipal garbage service from January 11 to the end of November, 1937. From January to June, Escudero reported to witness the names of the employees engaged in the removal of garbage. In July, the mayor appointed Eduardo Hernández, who thereafter kept a list of employees as did Escudero. He did not include the name of Carrión. They brought to witness the list of employees, then witness went to Escudero or to Hernández in order to check the information, which witness had from the mayor, seated at the mayor's desk. Names were included and the mayor would say: "This man is assigned to this." The mayor ordered that José Rodríguez and Gerardo Montano should be included. Ceferino Medina was on the list because he had worked in the municipality. At other times the mayor had ordered that he be included.

On cross-examination: Ceferino Medina had worked in the municipality; the others also according to the information which witness had. Witness had seen Gerardo Montano in the mornings doing the cleaning. He had seen Ceferino Medina working in the streets. José Rodríguez was working for a time in the hospital. Witness had not seen Gerardo Carrión working in the town. There were many claims for wages as to which the mayor would say. "Dock this man half a day; it rained this morning; the cleaning could not be done; the truck did not work; on that truck, no, he worked on this one; dock this man two days and give this one two days." Eduardo Hernández was a timekeeper after July 1.

For the defense Gerardo Carrión:

Lived on his own property adjoining that of Orestes Ramos. He had worked some eight months for the municipality in connection with work that was being done in the streets, and other public works. He had been paid by the municipality. He had worked from July 1937 to March 1938. After finishing his work with the municipality, he had worked on his own account, looking after his own interests. Witness had some cattle in an enclosure on the Orestes Ramos property. He had gone there in the mornings when he had time. It had been his custom to rise at 5 o'clock and when he had time he went to see his cattle before reporting to the mayor. He had also done this at noon and after 4 o'clock in the afternoon. He had worked in the municipality at times from 8 o'clock to five; at other times from 7 to 4. While being paid by the municipality, he had never worked for any other employer. The salary paid witness by the municipality was for services rendered by him.

On cross examination:

Witness had worked during those eight months as an inspector of municipal works on the roads. There had been times when witness had not worked the full week, but he had worked every week. His first assignment had been to attend to certain work that was being done on a road in Tierras Nuevas. The work had lasted some three weeks. Some ditches had been dug, a culvert had been made, and holes in the road had been filled. Witness had inspected the work and on occasions, when he had time, he had also worked. Elpidio Durán was in charge of the work. Eduardo Hernández was the timekeeper. Witness had not paid Orestes Ramos anything for pasturage. Witness was paid a dollar a day by the municipality when he worked. The work in Tierras Nuevas had extended over a period of some three months. Afterwards another piece of road was repaired in Coto Sur. The work had extended over a period of some two months. The mayor had sent witness at times on certain errands. Later

some two months had been spent in work at La Bajura, reducing the grade. Elpidio Durán was in charge of the work. Later, witness had worked on a *corral* at the hospital and had repaired a cornice of the hospital building. Elpidio Durán was in charge of the work. Witness had not been under his orders but had been sent by the mayor to inspect the work.

Virgilio Ramos Muñiz:

Gerardo Carrión worked for the municipality from July 3, 1937, to March 18, 1938. He was paid from different appropriations because he had been engaged in different capacities as assistant to the mayor. Witness had often needed an honest man whom he could trust to investigate certain matters in the interest of the public service. Carrión was paid out of the appropriation to which the greater part of the services he rendered were chargeable. It might appear from the vouchers that Carrión had been paid for certain work while otherwise engaged because during the greater part of the week he had been engaged as indicated in the voucher. In such cases, the services had been charged to the appropriation to which the greater part of the services rendered was chargeable. Carrión had worked on the Boquillas road, on the construction of a bridge, had inspected the bridge in order that the concrete might not disappear, that the stone delivered might be what was needed—a man who could lighten the mayor's work, who could inspect and report. Carrión had worked in the same way on the Carretera del Próspero, on the *corral,* on the fence at the slaughter house, on the hospital cornice, on the hospital enclosure, on the grade at the river. He had been sent to report on cases of alleged illness. Witness had not made use of other such employees because there had been no money with which to pay them.

On cross-examination:

The bridge referred to was a culvert. Carrión had served as foreman and at the same time, as a *peón* in the work on the roads. Elpidio Durán was the person responsible for the

work and at the same time had worked as a *peón*. Witness sent Carrión at times to see whether the removal of garbage had been properly effected. Carrión had also worked in the cutting of the sidewalks and on the repair of streets. He might have appeared in a voucher for the cleaning of offices when other appropriations were exhausted. He had done whatever work had been required of him. When the vouchers read "in the service of the mayor" the auditor could have explained better than witness.

José Rodríguez:

Had worked for the municipality from July to March. While employed by the municipality he had not worked for any one else. His work had been to rise early and when he was tired to mount the mayor's horse, inspect the work of the street sweepers, and report to the mayor. It had also been his duty to wind the clock twice a week. He had worked from two to two and a half or three hours in the morning as required, and in the afternoon; and later he had wound the clock on Tuesdays and again on Thursdays, Fridays or Saturdays; it had been his duty to do this twice a week.

On cross-examination:

Witness had worked two or three hours in the morning and had been credited with half a day; he might have been credited with a whole day; he had not been credited with more than a half day or if not, then three-eighths of a day; if three or four hours had been required, he had been credited with half a day. A half hour had been required to wind the clock. At times witness measured the depth of the water in the aqueduct tanks.

Virgilio Ramos Muñiz:

Rodríguez had been employed by the municipality for a period of ten months. His work had been to wind the clock and to see whether the work of the street sweepers during the night had been efficient. The garbage truck made its rounds during the night, and it had been the duty of Rodríguez to see whether the garbage had been removed. He had

been paid, as a rule, as an assistant from the mayor's appropriation.

On cross-examination:

The budget had contained no appropriation for a clock man. It had been the duty of Rodríguez in the mornings to see whether the street sweepers had been performing their duties and in the afternoons to see whether the garbage had been removed from the garbage cans.

Ceferino Medina:

While employed by the municipality as street sweeper had not worked for any one else. He had worked for the mayor several months, but not continuously, chopping, driving stakes, and milking the cows. When witness worked in the mayor's stable, he was paid at the mayor's store. When driving stakes and milking the mayor's cows, he had not been paid by the municipality. While being paid by the municipality, witness had been engaged in sweeping the streets. Witness had worked for the mayor six days or a week at a time in February and March. He had worked fifteen days with the mayor; a week of six days, another week of six days and a week of three days in different months during 1938.

On cross-examination:

Witness had worked from 7 to 4 as a street sweeper; he had never worked at night. He had worked alone at a place called "El Ensanche". He had not worked anywhere else. Witness had been responsible to the mayor—not to any one else. There was a timekeeper whose name witness did not remember. The timekeeper had seen witness at work and had made a note of it. It was not José Rodríguez. Witness had never seen José Rodríguez inspecting the street cleaning. Witness had not seen Gerardo Carrión at work as timekeeper or inspector of street cleaning. Witness did not remember who the timekeeper was to whom witness had been responsible. Witness was sure it was not Gerardo Carrión or José Rodríguez. The timekeeper had travelled on foot. Witness had worked as a street-sweeper a number of weeks.

On re-direct:

The Ensanche was to the east. Witness had not worked in the town; a timekeeper named Eduardo had checked his work; witness did not know who had checked other zones of the municipality. Witness had kept to his own zone. He did not know who had worked or who had inspected the work elsewhere.

On further cross-examination:

Witness did not know whether the inspector was Eduardo Hernández; it seemed to him that it was Eduardo Hernández.

Virgilio Ramos Muñiz:

Ceferino Medina had been assigned to a special district, a part of the Ensanche. He had worked from February 12 to February 18, 1938, six days, four days with the municipality, and three days for witness in an enclosure on a property owned by witness at a place called the Powder House. For the work done for witness, Medina had been paid at the store; for the services rendered the municipality, he had been paid by the municipality; during the rest of the month he had worked for the municipality. During March, Medina had worked six days with witness and the rest of the month for the municipality at $1 a day while in charge of a part of the Ensanche. For the work done for witness, Medina had been paid at the store. Medina worked with the municipality during the entire month of April, less six days when he worked for witness, milking the cows, for which he han been paid at the store. For the services rendered the municipality, he had been paid by the municipality. In May, June and July, Medina worked for the municipality.

On cross-examination:

Tito Martínez checked the work done by Medina in the Ensanche. José Rodríguez and Tito Martínez had not worked at the same time. When Gerardo Carrión was at work, the other was not there.

Eduardo Hernández:

Had been a timekeeper; Medina and Rodríguez had worked for the municipality. Witness had seen José Rodríguez at times; he would come for the clock key; he would wind the clock and afterwards witness had seen him inspecting the garbage trucks. Witness had asked him what he was doing and he had answered that he was working. Gerardo Carrión worked for the municipality. Witness had seen him at work at times as inspector. When stone or anything else was lacking, witness made a note of it. Gerardo Montano had worked for the municipality; he had cleaned the walls, he had washed the stairway; he had dusted the desks; all the employees had seen him. Witness had made a note of the names Gerardo Montano, José Rodríguez, Ceferino Medina and Gerardo Carrión as municipal employees. Gerardo Montano, as witness remembered, had begun work in July, 1937 and had worked four or five months.

On cross-examination:

Witness kept a list of municipal employees. At the beginning, Cornelio Escudero had been in charge of the garbage and he had taken the names of the *peons* engaged in the removal of garbage. José Rodríguez had wound the clock; had inspected the drums and had painted them; had done what the mayor had told him todo. When witness saw Gerardo Carrión at work, witness had made a note of it; at times Carrión had complained that witness had overlooked him. At times witness had asked the foreman in charge of the road work to furnish a list. Witness had risen at seven, had made a note of the persons at work. Cornelio Escudero, during the time he was in charge of the garbage, kept the list of the *peons* engaged in that work. Witness noted the name of Gerardo Carrión, who had begun work in July, 1937. Witness did not remember whether he had listed Gerardo Carrión for the week of July 3 to July 9, 1937. Witness did not remember whether he had listed José Rodríguez for the week of July 10 to July 16. Cornelio Escudero had been the time-keeper for the garbage work.

When Escudero left, witness had taken over that work. Witness had not listed Cornelio Escudero as a municipal employee. Witness could not say that Gerardo Carrión and José Rodríguez had been engaged in the garbage work because Escudero had been in charge of that. Witness could not say whether during the week of July 10 to July 16, José Rodríguez had worked in connection with the removal of garbage.

On re-direct:

Gerardo Montano had worked two or three weeks in the beginning of 1938.

Arsenio Carreras:

In the latter part of February or in March, Gerardo Montano had come every day in the morning and had cleaned the offices—during the greater part of March.

On cross-examination:

Witness did not know what Gerardo Montano had done after 8:30 in the morning.

Zoilo Cardona Rodríguez, the janitor:

Had worked from 6 to 6. Gerardo Montano had worked from January 25 or 26 to March 4 or 5, 1938, cleaning the offices, the lavatories, and the municipal assembly hall. He had worked from 7 to 12 and from 1 to 4.

On cross-examination:

Witness in addition to his duty as a janitor, was a porter in the mayor's office. Montano had been his assistant; had cleaned the offices between 7 and 9:30 and thereafter had been subject to the orders of witness. Montano had carried the letters to the post office.

Virgilio Ramos Muñiz:

Montano had worked twenty-four days cleaning the building. He worked eight hours a day. He had been discharged by witness. Montano had not worked elsewhere while he was being paid by the municipality.

On cross-examination:

Montano had never worked for witness. From hearsay,

witness knew that Montano lived on the Orestes Ramos property.

The evidence adduced in support of the charges eleven to fifty-five, inclusive, established a prima facie case. The testimony for the defense leaves much to be desired. Orestes Ramos, owner of the property where Carrión kept his cattle was not called as a witness. Carrión himself testified that he was paid only a dollar a day for such services as he may have rendered the municipality and that he kept his cattle on the property owned by Orestes Ramos. He paid nothing for pasturage. In the absence of any explanation as to why he was permitted to keep his cattle on the Ramos property without paying for the privilege, his denial of the probable fact that he was employed by Ramos does not inspire confidence. Rodríguez, Medina and Montano, while being paid by the municipality, may or may not have been employed by the mayor, as set forth in some of the charges. All four were placed upon the pay rolls by the mayor or by his order. Most of them seem to have had ample time which might have been devoted to the performance of some useful task. Their duties as municipal employees were not ardous.

Medina had worked both for the mayor and for the municipality. When he worked for the municipality he was assigned to a special district. Apparently he had a special timekeeper to check his work. According to Medina's testimony he was responsible only to the mayor and he did not know the name of his timekeeper, if any. The mayor testified that Tito Martínez checked Medina's work. Tito Martínez did not appear as a witness and was not identified as a timekeeper or as a municipal employee by any witness except the mayor.

José Rodríguez—at least when he was tired—seems to have performed his duties on horse back. He rode the mayor's horse. He was paid from the mayor's appropriation as an assistant. His work was to rise early, inspect the work that had been done by the street sweepers and report

to the mayor. Twice a week he wound the clock. At times he measured the depth of the water in the aqueduct tanks.

Montano's principal duties were to clean the offices, the lavatories and the assembly hall. He cleaned the offices between 7 and 9:30. The number and size of the lavatories and the time required to clean them were not shown. How often he cleaned the assembly hall does not appear. He had also carried the letters to the post office.

From July 1937 to March 1938, Carrión, according to his testimony, had been employed by the municipality as an inspector of work that was being done by the municipality on public roads. He had first inspected work that was being done on a road in Tierras Nuevas. The work had lasted some three months. Next for two months he had inspected work that was being done in Coto Sur. Later some months had been spent on work at La Bajura reducing the grade. From municipal pay rolls introduced in evidence it appeared that no roads were repaired during July, August and September 1937. The same documentary evidence disclosed the fact that from July 1, 1937 to June 30, 1938, only sixty days had been devoted to such work.

Neither Carrión nor the mayor explained just what work was done on the *corral* or on the hospital cornice or on other odd jobs, or how much time was required to do the work. As we remember there was but one definite instance of the cases investigated by Carrión before admission to the hospital. The municipal auditor was also the mayor's confidential secretary. It may be, as suggested, by the mayor, that the auditor could have explained better than the mayor the meaning of vouchers for expenses incurred "in the service of the mayor." The testimony of the auditor as a witness for the mayor speaks for itself.

The mayor seems to have been pretty well provided with assistants. The municipal auditor, Eduardo Hernández, José Rodríguez and Gerardo Carrión all contributed to lighten his labors. Zoilo Cardona Rodríguez, the janitor was

another assistant in addition to his duties as porter. He himself had an assistant who did what little work the janitor, but for such assistance, might have been required to do as janitor.

The mayor himself says that he did not employ a greater number of assistants only because there was no money with which to pay them.

As repeatedly pointed out by the mayor in the testimony concerning other charges, the municipal finances were in a deplorable condition. The difficult position in which the mayor was placed, no doubt, made a strong appeal to the sympathy of the municipal assembly. It has made a strong appeal to our own sympathy. That appeal would have been stronger yet if the mayor had been more parsimonious in his disbursements of municipal funds to provide sinecures for at least two or three municipal employees whose official duties could have been performed by one. This is an important element in the general atmosphere of the case.

It would be easy enough to say that Carrión, Rodríguez, Medina and Montano did not render the services for which they were paid by the municipality and that the municipal assembly erred in not so finding. It would have been even easier to say that the mayor had appropriated to his own use a part, at least, of the funds collected for the purchase of fire hose and fire hydrants (notwithstanding the belated payment, if any, of the Vigo and Montes accounts) and that the municipal assembly erred in not so finding. Since the mayor has been acquitted of these charges by the municipal assembly—and since the removal of a public official for official misconduct, especially for misconduct involving moral turpitude is a serious matter—we prefer to base our decision on other grounds.

Charge fifty-six was, in substance, that the mayor had certified and approved a certain pay roll extending over a period from July first to October 15, 1937, and presented the same to the municipal auditor, who issued his warrant

to the municipal treasurer for the payment of $35 to Francisca Haw, as an employee of the municipal hospital; that the mayor was aware of the fact that Francisca Haw had not rendered services to the amount of $35 as indicated by the pay roll; that, by virtue of such certificate, the municipal treasurer delivered to the mayor $35 out of which he had paid Francisca Haw $9 only, and had appropriated the balance of $26.

Francisca Haw:

Was an assistant nurse, not a graduate. She had worked in the Manatí hospital. She did not remember where she had worked in June and July of the preceding year, but in April or July she had worked in the municipal hospital of Manatí. She did not remember how long she had worked, but it seemed to her that it had been a month and some days. She had received $10 for her work. She had not signed the document exhibited to her.

On cross-examination.

Her sister, Victoria Haw, also was employed as a nurse. Victoria had been employed about a year and a half. The signatures exhibited to witness were Victoria's. She had signed for witness. Witness had authorized Victoria to sign for her.

Arsenio Carreras, municipal treasurer:

Had paid the $35 to a hospital nurse named Miss Haw in the mayor's office. He had not personally delivered it to the mayor. She was near the table and witness had placed it on the table, where she was talking to the mayor—the mayor's table. Witness did not know what she had done with it. The mayor had approved the voucher. Witness had not paid any money to Francisca Haw, the person named in the voucher. Witness was not certain that he had delivered the $35. He had left it on the table in the presence of the young lady.

On cross-examination:

He had taken the $35 for the purpose of delivering it to

the young lady, who was waiting for it and had placed it beside her. Witness knew that it was for her, it was she who had signed and collected. Witness counted it and put down before her. Witness did not know who had prepared the pay roll. The auditor had delivered it to witness with a warrant authorizing payment to Miss Haw, and witness had paid Miss Haw (here witness identified his own signature and that of the mayor).

On re-direct witness identified a warrant, number 486, including three different vouchers: one for $35, wages; another for $19.50, wages; and a third for $37.75. The warrant included the voucher for $35. Witness identified a check for $35, number 17,786, as corresponding to the warrant.

On further cross-examination: Witness had not made any other payment to Miss Haw or to her sister for the same period of time covered by the check. Witness did not know whether Miss Haw had worked at the hospital during that time because witness had not been in the hospital.

On further re-direct:

Witness had nothing to do with the hospital. The mayor was director of charities.

Gonzalo Córdova Chirino, municipal auditor, as a witness for the defense:

Victoria Haw and Francisca Haw had worked in the hospital. Witness had seen them often. They were nurses. They were paid by the municipality. The last payment to Victoria had been made in April or May, when she ceased to work for the municipality. Victoria Haw had been employed from January 1937 to April or May 1937 at $15 a month—from January 11 to June 30. In the new fiscal year her salary was fixed at $20 a month. Those amounts were paid to Victoria Haw. The last payment had been made by an ordinary voucher in favor of Victoria Haw for the month during which the services were rendered. $35 had been owing to Victoria Haw. Witness could not specify the debt. She had begun work in January. There were no funds out

of which she could be paid. She had not been paid out of the budget for that year. The debt remained pending.

On cross-examination:

Victoria Haw was working July 1, 1937. Had continued working without interruption until May, 1938. There had been a $35 voucher for July. She had been paid at the end of each month. Francisca began to work July 1. According to the vouchers, she had continued to work until October 15. From July 1, 1937, to October 15, 1937, both sisters had worked and were paid. Witness had seen them often. His knowledge was from the pay rolls, based on information received by him. Witness did not know whether Francisca had been working from July to October, 1937, but according to the pay roll, both had been working at the same time.

On re-direct:

The voucher issued to Francisca Haw was not for a debt owing to Francisca Haw. There had been a debt owing to Victoria from January 11 to June 30, 1937, which amounted to some $90, it could not be paid during that year. She had continued to work month after month and she was paid $35 a month in the new budget; and later there was a balance of $35 due her. Then they told witness to prepare a voucher for Miss Haw in the sum of $35, balance due her; and the voucher was made to Francisca Haw for three months and a half "which corresponded to her".

On further cross-examination:

There had been $60 more or less owing to Victoria Haw corresponding to the budget for 1936-37. It had not appeared on the books because witness had not made vouchers during that period. She had been working in the hospital and the pay rolls reached the books only when they were to be paid. She had worked five months and a half at $15 a month, according to the information received by witness from the mayor. Because this had not been paid, the voucher had been made out to Francisca Haw for $35 for two and one-third months at $15 per month. All of the

vouchers made from July 1, 1937 to Victoria Haw had included an additional amount in payment of the previous debt. Her salary was $20 and she was paid $35—$15 additional on account of the previous debt. This had been during July and August only. She was absent six days in September. She was paid $35 in July: $20 salary and $15 on account of the previous debt. She was paid $35 in August: $20 salary and $15 additional. In September, she was paid $16.65, discounting the first six days of the months and without any additional amount on account of the previous debt. Witness did not know why the $15 additional on account of the previous debt was being paid in September. The payment of $35, instead of $20, had been made pursuant to an understanding between witness and the mayor. Witness knew that her salary was $20 and had paid her at the rate of $35 on account of the previous debt. In October, she was paid $20. Victoria Haw continued to work until May, 1938. From October, 1937 to May 10, 1938, she was paid at the rate of $20 a month, without any additional amount on account of the previous debt. During that time she was paid in all $30 on account of the debt for 1936-37. The debt amounted to $82.50. There had been a balance due of $52.50, the difference between $82.50 and $30. The whole of the Francisca Haw voucher for $35 was paid to Victoria Haw. Francisca was paid on other vouchers for the services rendered by her. Witness had paid the $35 in settlement of the balance due. She had not claimed the $17.50. She had left the municipality. Witness did not know why the practice of including an additional $15 in the monthly salary payment to Victoria Haw had been discontinued; perhaps witness thought the continuance of the practice improper. When witness learned that the purpose of the Francisca Haw voucher was to pay the sister, Victoria Haw, the voucher had been already prepared and paid. The treasurer had paid it. Witness had prepared it. Witness had learned afterwards that the $35 was to be paid to Victoria Haw.

Witness learned this by virtue of the investigation that had been made. Witness prepared a voucher for Victoria and they told him: ''The work to be paid to the Haw woman, as Francisca.'' The voucher was prepared for Francisca. Then witness learned that it was the balance on Victoria's account. A claim had been presented to witness for services rendered by Miss Haw in the hospital. They had said Miss Haw. Victoria Haw appeared as having been paid for the months of July, August, September and October. Witness had prepared the voucher and had inquired whether the sister was also working. Then after the voucher had been made (witness did not know whether or not the treasurer had paid it) he had learned that it was for the balance of the Victoria Haw account. Witness did not know whether or not the treasurer had paid at that time. Witness had spoken of it as having been paid because he had issued the warrant; but witness did not know whether or not the treasurer had obtained the signature and had paid the money. Vouchers may be pending payment without having been paid. Witness referred to it as paid because he had issued the warrant. When witness prepared the voucher and issued the warrant, witness believed that the money was for Francisca Haw in payment of services rendered in the hospital. Francisca Haw had worked in the hospital; witness did not know how long. The Francisca Haw voucher had not been in payment of services rendered by Francisca Haw. There was a voucher for the services rendered by Francisca Haw. It was a voucher for $10; July 1 to July 4 at a dollar a day, $4 and July 5 to July 11, at a dollar a day, $6. That was all that had been paid to Francisca Haw. Besides the voucher referred to in exhibit 18, that was all that had been paid to Francisca Haw. Witness believed that Francisca Haw had worked in the hospital one month. It covered her services for the month; if an employee earns $10 a month, the minimum which the municipality can pay, $1; ten days $10, that is all that had been paid her; that is to say, if

she had worked for one month and had received no more than that she had been working for $10 a month. The two vouchers certified by witness for services rendered by Francisca Haw from July 1 to July 4, 1937, and from July 5 to July 11, 1937, paying her twice for the same services, might have been an error in the preparation of the voucher.

Witness had issued the warrant for payment of voucher number 39. He had prepared the voucher for $35 pursuant to an order given by the director of charities, the mayor. Witness did not remember whether the mayor had told him that the money was for Victoria Haw and owing to her from the previous budget. Witness had learned that from Victoria herself after issuance of the warrant and delivery to the treasurer of all the papers necessary for payment. Witness had asked her what she was going to do with her money and she had answered that she had been paid. The first information received by witness was from Victoria because she was about to sail. Witness had talked to the mayor and the mayor had told him that it was true. With reference to the personal knowledge to which witness had testified on direct examination, witness had obtained this information from Victoria and from the mayor after the transaction. Witness had considered that information, once received by him, a matter within his personal knowledge. Witness might do something without knowing what he was doing and in the light of subsequent events by reason of information subsequently received, might realize that what he had done was wrong.

On further re-direct:

Victoria Haw earned $15 a month; from July 11 to July 31 were twenty days at fifty cents a day, twenty days would amount to $10. In February, March, April, May and June at $15 a month—January $10, February $15, etc.—the total would amount to $85 not $82.50. She had been paid $35 in the month of July. Witness did not remember whether Victoria Haw had worked in the hospital in July. She had

been paid $35. At the end of the year 1936-37, the municipality was indebted to Victoria Haw for services rendered by her as nurse in the municipal hospital. At the time of the impeachment proceeding she was not claiming anything from the municipality; she said that she had been paid.

On further cross-examination:

Witness did not remember whether Victoria Haw had worked in July, 1937. According to the vouchers, she had worked in July, August and September. According to the pay roll, she had worked from January 11, 1937 to May 10, 1938. There was a voucher for September which indicated an absence of six days. Witness did not remember whether she had worked in July, just as he did not remember whether she had worked in July, August and September.

Dr. R. Rodríguez Buxó:

Victoria Haw had worked from January 11, 1937 to May 10, 1938. There had been some vacation periods. Witness did not remember whether any of these had occurred in July or August, 1937. There had been some four weeks of vacation, in July or August. She was paid every month after July. She had been absent at times from two to five days. There was a longer period in July or August, 1937; some four weeks. Witness did not remember whether she had taken any vacation in September. She had begun work at $15 a month—from January to June. After July, on witness' recommendation, her salary had been raised to $20 a month.

On cross-examination:

The hospital employees, including Victoria Haw, were named by the municipal director of charities, Virgilio Ramos Muñiz.

On re-direct:

The nurses had borrowed money at times from witness and from the mayor. Witness had not charged any interest.

Virgilio Ramos Muñiz:

Francisca Haw had been employed in the municipal hospital thirty-two or thirty-three days as an assistant nurse

at $10 a month. She began work July 1, 1937. She did not return to work after the month of July. Victoria Haw had worked from January 11, 1937, as assistant nurse in the municipal hospital at $15 a month. The appropriation for municipal hospital salaries, except as to the salary of the hospital physician, had been exhausted. The salary of Victoria Haw and others had been taken care of by loans and money advanced by witness. Otherwise the hospital could not have been kept open. The same thing happened as to food. Witness had to collect money in order to keep the hospital open. The hospital physician had to lend the nurses money out of his salary, without expectation of payment. It was not administration, but a struggle to keep the hospital open. During that five months and twenty days, witness had advanced money to Victoria Haw and to others out of party funds, regardless of possible consequences. Witness had to keep the hospital open and cost what it might, he had kept it open. Witness had sent a number of telegrams to the auditor but had received no reply. Witness was without friends save those from whom he begged money for hospital maintenance. If witness had not advanced money to the nurses, they would have left the hospital. There was $85 owing to Victoria Haw at the end of the fiscal year. There was no municipal assembly. Witness had visited the auditor a number of times. Eighteen months had passed pending a meeting of the party territorial committee. There was no municipal assembly. A budget had been prepared by the auditor of Puerto Rico identical with that of the previous year. There was no way in which provision could be made for the payment of debts previously incurred. Hence, they had overstepped the bounds prescribed by the regulations. The regulations, witness thought, presupposed the existence of funds. When there are no funds, the regulations have nothing to do with the case. In July, the hospital physician recommended that Victoria Haw be given a salary of $20; but she had been working five months twenty days and wanted

a vacation which she took. She was paid for the month of July without having worked; but the $35 was owing to her on account of the indebtedness amounting to $85. In subsequent months she was paid at the rate of $20 and an additional amount on account of the $85 due from the previous budget. In July she was paid $35 without having worked; in August she was paid $35, $20 as salary for that month and $15 on account of the $85 due her; in September she was paid $16.65 instead of the full amount, $20, because she had taken a six day vacation. That payment (referring to an unidentified voucher) calculated from July to October 15, was on account of the debt due for the period extending from January 11 to June 30. As to whether the debt owing to Victoria Haw had been liquidated with the payment to Francisca Haw, "$35 and $35, $70, and $15 paid in August are $85." The $35 referred to in exhibit 18 belonged to Victoria instead of Francisca. A check, when cashed by the treasurer must be signed as the check says; and a voucher must say what it says in order to be paid. There were two Miss Haws; it was an unusual name; the given name was never mentioned, but the surname, as they were always Miss Haw; hence, the mistake; it should have been made payable to Victoria instead of to Francisca, in order that the $35 might appear as belonging to Victoria to whom they belonged who was the owner thereof and collected it, who had the authority and could come to sign for her sister. That young lady had seen the auditor and the necessary voucher had been prepared with a lot of mistakes—with one-fourth of a day and one-eighth of a day, day by day and extra hours at the government rate. Then we would have to have a budget of $300,000. This combination of days is effected so that the employee may appear to have been working at intervals each day. Thus it reads from July 1 to September 19, amounting to $35; this was Victoria's, never Francisca's; it was owing to Victoria. Victoria had signed the voucher. While the voucher was being prepared, Victoria had come to the

mayor's office and waited until it was finished because it was a slow process. When it was finished she went out and signed. A moment later the treasurer came and counted out $35 on the desk where witness sat, on the side where Victoria was seated. Victoria received the $35. That same afternoon she refunded the money which witness had advanced to her out of the party funds; she paid of her own volition $26 which she had taken from the party funds. Witness counted that payment and put it in the place where it belonged—in the proper envelopes. Victoria Haw and Francisca Haw were sisters. Victoria signed for Francisca, and took the money which was hers, not Francisca's.

On cross-examination:

Witness had the letters in which Victoria Haw had requested advances. The total amount so requested amounted to $26. In September Victoria was paid her salary of $20 only because that time the voucher was made for $35 in the name of Francisca. Witness was the mayor; it was the auditor who kept the accounts. In October, Victoria Haw was paid $20 for her services; nothing on the previous account. The voucher for $35 should have read Victoria Haw instead of Francisca. Witness had called it a mistake because Francisca had no interest in the matter. She had been paid for her services. Witness had a secretary; the question as to whether a separate voucher for $20 in the name of Victoria might have been included in a single voucher for $55 was a matter within his discretion. That was an irregularity arising out of great irregularities involved in the failure of the People of Puerto Rico to provide a municipality with an assembly from the beginning. The intention was to pay what was owing to Victoria; witness had been fully aware that Francisca had no interest in the matter. Francisca had no interest in the matter. Francisca had worked thirty-five days. She had been paid. The voucher, in conformity with the established system of government, had specified ten days; from June 1 to 4, July 5 to 11, ten

days, at a dollar a day, $10. The truth was that she had worked from July 1 to July 30. The voucher was signed by the director of charities, July 31, by witness in person. The name Francisca in the $35 voucher for October was a mistake; it should have been Victoria. Witness had not noticed the name. With reference to the two vouchers for the same month, one for $20 and the other for $35, witness thought that inasmuch as the debt amounted to $85, Victoria had earned the money regardless of when it was paid. The $35 was for Victoria and witness signed the voucher "to Victoria". Witness knew that the $35 was still owing to Victoria, but he had not noticed that the voucher was in the name of Francisca. Witness knew that the paper was replete with figures, the usual numeration. Victoria had been in the employment of the municipality up to May 10, 1938. In the months in which no installment had been paid, there was a scarcity of money on hand with which to meet obligations that could be postponed. They had paid $35 in July, $35 in August, but it was only $15. In September, there was no money for the $15. The checks received by witness had been delayed fifteen or twenty days, until every one else had been paid, in order that others might be paid. The scarcity of money was one of the reasons; the auditor might have knowledge of others.

Extended comment would seem to be superfluous. The only mistake was a deliberate misstatement. The mayor was aware of what he was doing. There were extenuating circumstances. It may be conceded that the money was owing to Victoria Haw and that, as to the $26, the mayor was merely reimbursing himself for money previously advanced to Victoria. It may be conceded that no moral turpitude was involved.

There can be no reasonable doubt that the mayor certified and approved the Francisca Haw pay roll with knowledge of the fact that Francisca Haw had not rendered the services in question. There can be no reasonable doubt that

the mayor failed to deposit in the municipal treasury the money collected for the purchase of fire hose and the repair of fire hydrants. These irregularities cannot be torn from their setting and regarded as isolated facts. They must be considered in the light of all the circumstances. Standing out as they do against the background of all the evidence in the case, they leave open to us but one course of action.

In view of the foregoing conclusion the first of two questions discussed at some length in the brief becomes academic. That question raised by the first assignment was whether the municipal assembly erred in exonerating the mayor on the ground that the charges had not been established beyond a reasonable doubt. The second is as to whether the conclusion reached by the municipal assembly is equivalent to the verdict of a jury and therefore binding on this Court.

There may be some analogy between the verdict of a jury and the finding of a municipal assembly in an impeachment proceeding. The analogy, if any, is not very close. It would suffice to say that there is a wide and obviously important difference between the way in which a municipal assembly is constituted and the manner in which a jury is selected to try a case. We need not go into the well-known details of distinction. It may be conceded without holding that the decision of the municipal assembly should not be reversed in the absence of passion, prejudice and manifest error in the weighing of the evidence. Beyond this we are not prepared to go.

The decision of the municipal assembly must be reversed and because of the irregularities involved in the fifty-sixth and in the first six charges, the mayor will be removed from his office.

Mr. Justice Travieso took no part in the decision of this case.